**Date Signed:**
**July 21, 2015**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>MIGUEL ALFONSO RAMIREZ and<br>VALERIE SHAFFER DE RAMIREZ,<br><br>            Debtors. | Case No. 14-00239<br>Chapter 7 |
| 1726, INC., a Hawaii corporation, et<br>al.,<br><br>            Plaintiffs,<br><br>   vs.<br><br>MIGUEL ALFONSO RAMIREZ and<br>VALERIE SHAFFER DE RAMIREZ,<br><br>            Defendants. | Adv. Pro. No. 14-90039<br>Lead Case<br>(Consolidated with:<br>Adv. Pro. No. 14-90025<br>Adv. Pro. No. 14-90027<br><br><br>Re: Docket No. 1 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of these adversary proceedings was held on April 27 through May 1,

2015. Christopher J. Muzzi appeared for 1726, Inc.; Gary Levitt appeared for Mark

Glen; Michael Glenn appeared for Miguel Alfonso Ramirez and Valerie Shaffer de Ramirez; and Greg Markham appeared for National Industrial Tire of Hawaii, Inc., Andrew Souza, and Roxann Souza.

These findings and conclusions pertain to all claims asserted in A.P. No. 14-90039 and the claims asserted in the complaint filed in A.P. No. 14-90027. The counterclaim filed in A.P. No. 14-90027 has been bifurcated and will be decided in the district court. A.P. No. 14-90025 has been dismissed by order entered on June 25, 2015.

Based on the evidence presented, I make the following

## FINDINGS OF FACT

1.      1726, Inc. ("1726"), is a Hawaii corporation of which Mark Glen is the president and principal. 1726 sometimes does business as Mark Glen Auctions.

2.      Pintor Services, LLC ("Pintor"), is a Hawaii limited liability company, the members and managers of which are Miguel Alfonso Ramirez and his wife, Valerie Shaffer de Ramirez.

3.      National Industrial Tire of Hawaii, Inc. ("NITOH"), is a Hawaii corporation that is owned and operated by Mr. Andrew Souza and Mrs. Roxann Souza.

4.      At trial, Mr. Glen, Mr. and Mrs. Ramirez, and Mr. and Mrs. Souza testified. I found Mr. Glen's testimony credible. I found most of the testimony of Mr.

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed  07/21/15   Page 2 of 21

and Mrs. Ramirez, and some of the testimony of Mr. Souza, not credible. In particular, much of Mr. Ramirez' trial testimony was implausible on its face and inconsistent with his prior sworn statements.

5.      During the relevant time period, 1726 sometimes made loans, although that was not its principal business.

6.      During the relevant time period, NITOH was in the business of buying tires wholesale and reselling them to retailers.

7.      During the relevant time period, Pintor was in the business of selling tires.

8.      In 2008, Pintor entered into an factoring agreement with Hawaii Receivables Management LLC ("HRM").

9.      Factoring is a mechanism under which a seller can obtain loans using its accounts receivable as collateral. After a seller of goods issues an invoice to its customer, the seller "sells" the account receivable evidenced by the invoice to the factor. Although the transactions are "sales" in form, they are secured loans in substance. The factor typically checks with the customer to make sure that the invoice is valid and that the customer will pay it in due course. The factor then pays the seller a percentage of the invoiced amount, and the factor and the seller direct the customer to pay the entire amount of the invoice to the factor. When the factor receives payment from the customer, the factor remits to the seller the amount of the payment

3

less the amount advanced by the factor and an interest charge on the advance.

10.     It is very important to the factor that the invoice represent a genuine obligation of the customer to pay the invoiced amount. The debt evidenced by the invoice is the factor's collateral. If the customer does not owe the amount set forth in the invoice, the factor's collateral is questionable.

11.     In this case, Pintor issued invoices to NITOH which purported to represent bills for tires sold by Pintor to NITOH. Pintor then presented each invoice to HRM. After verifying with NITOH that the invoice was valid, final, due, payable, and not disputed, HRM lent Pintor eighty percent of the invoiced amount. Pintor and HRM instructed NITOH to pay the invoice to HRM rather that Pintor. When NITOH paid HRM, HRM remitted to Pintor the amount of the payment minus (a) HRM's loan against the invoice and (b) a "Discount Fee" equal to 2.85% of the advance if the invoice was paid in the first thirty days plus 0.95% of the advance for every ten days thereafter until the invoice was paid. In substance, HRM lent Pintor eighty percent of the amount of each invoice, and Pintor paid interest to HRM at approximately 2.85% per month.

12.     In 2010 and 2011, Pintor factored NITOH invoices to HRM in an aggregate amount of $2,468,520.62, and HRM advanced about $1,974,816.50 to Pintor. Pintor repaid almost all of HRM's advances and fees.

13.     In the meantime, Mr. Glen and Mr. Ramirez became acquainted

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed 07/21/15   Page 4 of 21

through a real estate transaction that did not come to fruition.

14.     In June 2009, 1726 lent Mr. Ramirez $30,000.00. The loan was secured by eight horses and certain tack and polo equipment. Mr. Ramirez repaid this loan.

15.     In 2009, in an attempt to increase its profits, Pintor decided to buy container loads of tires in China, import them to Hawaii, and sell them to wholesalers (mostly NITOH) for resale. The difficulty for Pintor was that Pintor would have to pay its Chinese suppliers for the tires up front, but would not get paid for the tires until the tires were delivered in Hawaii weeks or months later. Pintor apparently had no capital of its own, so Pintor had to borrow the money to finance its Chinese tire purchases. Pintor could not borrow the required money from HRM because HRM had imposed a credit limit on Pintor.

16.     At some point in 2009, Mr. Glen and Mr. Ramirez orally agreed that 1726 would replace HRM as Pintor's factor and would make loans to Pintor to finance Pintor's purchase of tires. 1726 and Pintor intended that the terms of their arrangement would be essentially the same as the HRM agreement, except that, in addition to the Discount Fee, 1726 would be entitled to fifty percent of Pintor's profit on each sale of a container load of tires. 1726 knew of the terms of Pintor's agreement with HRM because Pintor had given 1726 a copy of that agreement. Although the parties never entered into a formal written factoring agreement, Mr. Ramirez confirmed in writing that the first loans had been made, that interest would

5

accrue at 2.85% monthly, and that 1726 was entitled to 50% of the profit on sales of tires to NITOH.[1] Mr. Ramirez also confirmed his personal liability for the loans.

17.     Mr. Ramirez testified that he thought the parties were entering into a partnership and that he expected Mr. Glen to draft a partnership agreement. I do not believe this testimony. It is inconsistent with Mr. Ramirez' other statements in which he refers to the transactions as loans, the parties' course of dealing, the contemporaneous documents which speak only of a loan obligation, and Mr. Ramirez' prior testimony in state court proceedings. Mr. Glen did not intend to create a partnership. Although Mr. Glen's emails sometimes referred to a joint business conducted by him and Mr. Ramirez, he was not expressing an intention to form a partnership, but instead was saying that he wanted to establish a mutually beneficial business relationship with Mr. Ramirez. (Even if the parties intended to form a partnership, Mr. Ramirez would still be responsible for his false statements described below.)

18.     Pursuant to the oral factoring agreement, 1726 made about thirty-one loans to Pintor, each of which was tied to a container load of tires and a purported invoice from Pintor to NITOH for those tires. These loans amounted to about $1,400,000.00 in total.

_____

[1] Trial exhibit 44.

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed 07/21/15   Page 6 of 21

19.     Mr. Ramirez made multiple misrepresentations to 1726 when the oral factoring agreement was made. He repeated these misrepresentations, or failed to disclose to 1726 that the representations were no longer true, each time 1726 made a loan to Pintor.

a.     Mr. Ramirez represented that Pintor would use the proceeds of 1726's loans to purchase tires. This was false; Pintor actually used a substantial portion of the loan proceeds to repay loans made by HRM and to fund Mr. and Mrs. Ramirez's other businesses.

b.     Mr. Ramirez led 1726 to believe that Pintor was no longer factoring invoices with HRM. This was false; Pintor continued to factor invoices to HRM until 2011.

c.     Each advance by 1726 to Pintor was based on an invoice, which purported to show that NITOH owed Pintor a certain amount of money for tires. The invoices were false. In reality, the "invoices" did not evidence an obligation of NITOH to Pintor that was currently due and payable. Rather, the "invoices" indicated that NITOH had ordered tires from Pintor and that NITOH would pay for those tires only if and when they were delivered. Thus, the "invoices" were more akin to purchase orders. When he presented the "invoices" to 1726, Mr. Ramirez knew that they were not true invoices and did not evidence an existing obligation of NITOH to pay money to Pintor, but Mr. Ramirez did not disclose the truth to 1726.

7

d. Mr. Ramirez caused Pintor to repay seventeen of 1726's loans. Each loan was repaid via three checks; one for the principal amount of the loan; the second for the interest, and the third for 1726's profit share. Mr. Ramirez expressly or implicitly represented that, when Pintor issued each set of three checks to 1726, NITOH had paid Pintor for the relevant container load of tires. The payment of the purported "profit share" was a particularly strong statement that NITOH had paid Pintor, because if that had not happened, Pintor would have no profit to share with 1726. In many cases, this was false; Pintor repaid the 1726 loans and the profit share even though NITOH had not paid for those tires and there was no actual profit to divide. In some cases, the container load of tires was never delivered, and NITOH never paid for it.

20. Mr. Ramirez knew that these statements were false and that his omissions created a false impression. Mr. Ramirez intended to deceive 1726 and to induce 1726 to continue making loans to Pintor.

21. 1726 relied on Mr. Ramirez's statements, and on the false impression caused by his omissions, when it made loans to Pintor. 1726 had no reason to suspect that Mr. Ramirez was deceiving 1726.

22. Mr. Ramirez's misrepresentations and fraudulent omissions caused damage to 1726. In particular, 1726 would not have made loans to Pintor if it had known the truth.

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed  07/21/15   Page 8 of 21

a.　　1726 would not have lent money to Pintor for any purpose other than the purchase of tires.

b.　　1726 would not have lent money to Pintor if 1726 knew that Pintor was still factoring invoices to HRM. The fact that Pintor was continuing to borrow money from HRM had a material and adverse effect on Pintor's financial situation and its ability to repay 1726. Pintor's continued factoring with HRM created the false appearance that Pintor had more liquidity than it really did.

c.　　1726 would not have lent money to Pintor based on the "invoices" if 1726 knew that the "invoices" were more akin to purchase orders and that NITOH was not obligated to pay the amounts reflected in the invoices unless and until the tires were delivered. An invoice–a document evidencing a customer's current obligation to pay a specified amount of money–is significantly better collateral for a lender than a purchase order–a promise to pay for goods if and when they are delivered and unless the order is cancelled.

d.　　As is noted above, Pintor repaid some of the 1726 loans, including interest and the profit share, even though the tires had not been delivered, NITOH had not paid for them, and there were no profits to share. Pintor and Mr. Ramirez did this in order to create the false appearance that the tires were being delivered, that NITOH was paying for them, and that Pintor's business was functioning well. 1726 would not have continued to lend money to Pintor if 1726

9

knew that the tires weren't being delivered and NITOH had not actually paid the prior invoices.

23.     The unpaid principal amount of the loans is $391,693.18. Pintor also owes 1726 $465,719.51 of interest and reasonable attorneys' fees and costs. Mr. Ramirez's false statements and fraudulent omissions caused 1726 to suffer this amount of loss.

24.     1726 presented evidence to show that Pintor and the Ramirezes also defrauded HRM. For example:

      a.     The "invoices" which Pintor issued to NITOH and factored to HRM did not represent an obligation of NITOH to pay Pintor, but instead were really purchase orders. HRM would not have factored the accounts if HRM knew that the "invoices" were not what they appeared to be.

      b.     Pintor agreed that it would factor all of its invoices with HRM. HRM would not have lent against Pintor's invoices if HRM knew that Pintor was also factoring invoices with 1726.

      c.     In many instances, NITOH issued checks to HRM in payment for tires which NITOH had not received from Pintor. Pintor, through Mr. Ramirez, induced NITOH to do this by simultaneously reimbursing NITOH for the amount it paid to HRM. Pintor and Mr. Ramirez did this in order to create the false appearance that Pintor's "invoices" to NITOH were genuine invoices, rather than purchase

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed 07/21/15   Page 10 of 21

orders, and that the tires were being delivered and paid for as expected. If HRM knew that NITOH's payments to HRM were not genuine payments for tires delivered, and that Pintor was reimbursing NITOH for those payments, HRM would have stopped lending to Pintor.

25.     1726 did not establish, however, that 1726 is entitled to any relief on account of any fraud perpetrated by Pintor and Mr. Ramirez on HRM. There is no evidence that Pintor or Mr. Ramirez made any representations to 1726 about Pintor's dealings with HRM (other than the fact that a factoring agreement existed). There is no evidence that any fraud on HRM also injured 1726.

26.     1726 offered evidence that Pintor and Mr. Ramirez made false and deceptive statements to 1726 after 1726 made the last of the loans to Pintor. For example:

    a.     When Mr. Glen (on behalf of 1726) began to inquire about why Pintor had failed to repay the last loans, Mr. Ramirez and Pintor initially claimed that Pintor had delivered the tires to NITOH, but NITOH had not paid Pintor because NITOH's customers had not paid it. This was false; NITOH had not paid Pintor because NITOH had not received the tires.

    b.     Mr. Glen then contacted Mr. Souza directly to find out why NITOH had not paid Pintor. Mr. Souza said that NITOH had paid Pintor everything it owed. Mr. Glen and Mr. Souza then spoke to Mr. Ramirez, who said

11

that he would have to check his accounting records after he returned from a business trip to Mexico. Later, Mrs. Ramirez faxed to Mr. Glen purported copies of checks issued by NITOH to Pintor in payment for the tires covered by the unpaid loans. Those checks, however, were phoney; no such checks were ever issued by NITOH to Pintor. Pintor and Mr. or Mrs. Ramirezes (or both) created and used the phoney checks to hinder and delay 1726's efforts to collect its unpaid loans. (I do not believe the testimony of Mr. and Mrs. Ramirez and Mr. and Mrs. Souza that someone else created the phoney checks without the Ramirezes' involvement. The third party had no motive to create false documents independently.)

27. By the time these statements were made, however, 1726 had already made the last of its loans to Pintor. 1726 did not lend money, extend credit, or alter the terms of any existing indebtedness in reliance on these false statements.

Based on these findings of fact, I draw the following

CONCLUSIONS OF LAW

I. Jurisdiction and Venue

1. The court has personal jurisdiction over the parties and jurisdiction of the subject matter. The bankruptcy court has statutory and constitutional power to enter a final judgment. Venue is proper in this district.

U.S. Bankruptcy Court - Hawaii  #14-90039  Dkt # 133  Filed 07/21/15  Page 12 of 21

II.    Claims and Parties

2.    The constellation of claims and parties in these consolidated proceedings deserves clarification.

3.    In A.P. No. 14-90039, 1726 seeks a determination that the obligations of Mr. and Mrs. Ramirez to 1726 are not dischargeable in bankruptcy. 1726's complaint relies on sections 523(a)(2) and (a)(4) of the Bankruptcy Code.

4.    1726's trial brief and written closing arguments rely on sections 523(a)(2) and (a)(6) of the Code. 1726 has therefore abandoned any claims based on section 523(a)(4).

5.    1726 has never sought or obtained leave to assert claims under section 523(a)(6), nor did it plead the predicate facts to put the defendants on notice. That is an independently sufficient basis to decline to consider those claims. Out of an abundance of caution, however, I will address section 523(a)(6) below.

6.    In A.P. No. 14-90027, NITOH and Mr. and Mrs. Souza sue Mr. and Mrs. Ramirez, 1726, and Mr. Glen for a determination that Mr. and Mrs. Ramirez committed no fraud against 1726 or Mr. Glen within the meaning of section 523(a)(2) and that NITOH and the Souzas are not responsible to 1726. NITOH and the Souzas probably lack standing to seek a determination of the dischargeability of the Ramirez's debts to 1726. But no one has moved to dismiss their complaint, and addressing it will not require me to make any decisions other than those which A.P.

13

No. 14-90039 requires me to make. So I will not dismiss the complaint in 14-90027.

7.    In A.P. No. 14-90027, 1726 has filed a counterclaim against NITOH and the Souzas alleging that NITOH and the Souzas participated in the fraud perpetrated by Pintor and the Ramirezes. 1726 has demanded a trial by jury, which the bankruptcy court lacks the authority to conduct. Accordingly, the district court will separately decide the counterclaim.

8.    I have entered a separate judgment dismissing A.P. No. 14-90025.

III.  Section 523(a)(2)

A.    In General

9.    A chapter 7 discharge does not not discharge an individual from any debt for money to the extent that the debtor obtained it by "false pretenses, a false representation, or actual fraud . . . ."[2] The plaintiff must prove five elements:

(i)    Misrepresentation, fraudulent omission, or the debtor's deceptive conduct;

(ii)   Knowledge of the falsity or deceptiveness of his statement or conduct;

(iii)  An intent to deceive;

(iv)   Justifiable reliance by the creditor on the debtor's statement or conduct; and

(v)    Damage to the creditor proximately caused by its reliance on the debtor's

---

[2] 11 U.S.C. § 523(a)(2)(A).

14

statement or conduct.[3]

B.    Fraudulent Omission

10.    The plaintiff can establish that a debtor engaged in a fraudulent omission if he proves that, first, there was a duty to disclose a material fact; second, the debtor did not disclose that fact; and, third, the debtor's omission was motivated by an intent to deceive.[4]

11.    The Supreme Court has held that the common law in force when section 523 was passed and the Restatement (Second) of Torts should guide courts' interpretation of section 523(a)(2)(A).[5] Following that direction, the Ninth Circuit has relied on the Restatement when discussing the duty to disclose.[6]

12.    Section 551 of the Restatement explains that a party to a business transaction has a duty to disclose the following facts once the transaction is consummated:

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

---

[3] Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009).

[4] Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1089 (9th Cir. 1996); Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1246 n. 4 (9th Cir. 2001) ("A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive.") (citing Eashai, 87 F.3d at 1089-90).

[5] Field v. Mans, 516 U.S. 59, 70 (1995); Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte), 96 F.3d 1319, 1323-24 (9th Cir. 1996).

[6] Eashai, 87 F.3d at 1089; Apte, 96 F.3d at 1323-24.

15

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.[7]

C.    Justifiable Reliance

13.    A creditor acts in "justifiable reliance" on a debtor's misrepresentation if he did not have notice of the debtor's fraud.[8] Justifiable reliance is a lower standard of care than reasonable reliance. Under the justifiable reliance standard, the creditor may rely on a misrepresentation even if a reasonable investigation would have uncovered the fraud.[9] But he may not succeed in a section 523(a)(2)(A) action if he had notice of the fraud.[10] "The inquiry will thus focus on whether the falsity of the representation

---

[7] Restatement (Second) of Torts § 551 (1977).

[8]  11 U.S.C. § 523(a)(2)(A); Field v. Mans, 516 U.S. 59, 69-76 (1995); Citibank (South Dakota), N.A. v. Eashai  (In re Eashai), 87 F.3d 1082, 1090-91 (9th Cir. 1996).

[9] Eashai,  87 F.3d at 1089.

[10] Id.

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed  07/21/15   Page 16 of 21

was or should have been readily apparent to the individual to whom it was made."[11]

D.     Imputation of Fraud Among Spouses

14.     "[A] debt may be excepted from discharge either when (1) the debtor personally commits actual, positive fraud, or (2) the actual fraud of another is imputed to the debtor under partnership/agency principles."[12] Those principles do not support the imputation of fraud among spouses based solely on the spousal relationship. "[T]he marriage relationship itself is an inappropriate basis for imputing fraud."[13] If the spouses are also business partners, however, the imputation of fraud may be appropriate. "The nondischargeability decisions addressing imputed conduct, intent and liability are based on long-established principles of agency and vicarious liability."[14]

E.     Section 523(a)(2) Applied To This Case

15.     Mr. Ramirez's conduct described in the findings of fact constitutes false pretenses, false representations, and actual fraud within the meaning of section 523(a)(2). I have found that Mr. Ramirez knew that his statements were false and that he intended to deceive 1726.

---

[11] 4-523 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 523.08[1][d] (16th ed. 2014).

[12] Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 287 B.R. 515, 525 (B.A.P. 9th Cir. 2002).

[13] Id. at 526.

[14] Bendetti v. Gunness (In re Gunness), 505 B. R. 1, 6 (B.A.P. 9th Cir. 2014).

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed 07/21/15   Page 17 of 21

16.     1726 had no reason to suspect Mr. Ramirez's fraud. Therefore, it acted in justifiable reliance on Mr. Ramirez' misrepresentations.

17.     Pintor, NITOH, the Rodriguezes, and the Souzas emphasize that there was no written factoring agreement with 1726. This is irrelevant. Oral misrepresentations (other than misrepresentations about a debtor's financial condition[15]) can result in nondischargeability under section 523(a)(2)(A). 1726's failure fully to document its factoring arrangement with Pintor may have been unreasonable, but it does not negate 1726's justifiable reliance on Mr. Ramirez.

18.     Mr. Ramirez's fraud injured 1726. But for the fraud, 1726 would not have made the loans which Pintor and Mr. Ramirez have failed to repay.

19.     Mrs. Ramirez's conduct does not qualify under section 523(a)(2).

a.     Mrs. Ramirez did not "commit[] actual, positive fraud":[16] she did not make any misrepresentations to 1726 and did not engage in any conduct likely to deceive 1726.

b.     Mr. Ramirez's fraud cannot be imputed to Mrs. Ramirez based solely on their spousal relationship. The only business relationship between Mr. and Mrs. Ramirez that is relevant to the 1726 loans is their membership interests in Pintor.  The members of an LLC are not agents for each other and are generally not

---

[15] 11 U.S.C. § 523(a)(2)(B).

[16] Tsurukawa, 287 B.R. at 525.

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed  07/21/15   Page 18 of 21

liable for the debts of the entity or each other simply because of their membership in the LLC. [17]

        c.     Mrs. Ramirez wrote and signed many of the checks payable to 1726 and also transmitted information to 1726 at Mr. Ramirez's direction. 1726 did not show, however, that Mrs. Ramirez personally and knowingly engaged in fraudulent conduct or was complicit in Mr. Ramirez's fraudulent conduct in a way that would justify the imputation of his fraud to her.

        d.     It is not enough that Mrs. Ramirez benefitted from Mr. Ramirez's fraud. Traditional agency principles do not impute fraud to all beneficiaries of the fraud.

IV.   Section 523(a)(6)

20.    A debt "for willful and malicious injury by the debtor" is also not dischargeable.[18] To prevail, the plaintiff must establish both willfulness and malice.

21.    An injury is "willful" if (1) "the debtor had a subjective motive to inflict the injury" or (2) "the debtor believed that injury was substantially certain to occur as a result of his conduct."[19] The touchstone of this standard is that the debtor must

---

[17] Haw. Rev. Stat. §§ 428-303(a) (tort liabilities of an LLC are "solely" the liabilities of the company, and members are not liable "solely by reason of being or acting as a member or a manager."); 425-117(c) (same as to LLPs).

[18] 11 U.S.C. § 523(a)(6).

[19] In re Jercich, 238 F.3d 1202, 1208 (9th Cir. 2001).

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed 07/21/15   Page 19 of 21

have intended to injure the creditor. It is not enough to prove that the debtor acted intentionally and caused an injury.[20]

22.    1726 did not prove that either Mr. or Mrs. Ramirez acted willfully. Mr. and Mrs. Ramirez believed, however unreasonably, that Pintor would be successful and would be able to repay 1726. They did not intend to injure 1726 or subjectively believe that their conduct would probably hurt 1726. Therefore, 1726 has not carried its burden of establishing that Mr. or Mrs. Ramirez acted "willfully" within the meaning of section 523(a)(6).

23.    To prove that the debtor acted maliciously, the creditor must show four elements: "'(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'"[21]

24.    Mr. and Mrs. Ramirez did not intentionally do anything that would necessarily have injured 1726. Therefore, 1726 has not carried its burden of establishing that the Ramirezes acted "maliciously" within the meaning of section 523(a)(6).

V.    The "Loan Shark" Allegations

25.    Pintor and the Ramirezes contend that Mr. Glen is a "loan shark." It is true that Mr. Glen's company, 1726, charged interest to Pintor at high rates and took

---

[20] Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).

[21] Jercich, 238 F.3d at 1209 (quoting In re Bammer, 131 F.3d 788, 791 (9th Cir.1997) (en banc)).

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed 07/21/15   Page 20 of 21

aggressive steps in an unsuccessful attempt to get repaid. Pintor and the Ramirezes did not show, however, that any aspect of the loans or the collection activities was illegal or created a legally cognizable defense to any of 1726's claims.

## CONCLUSION

1726 is entitled to judgment in its favor and against Mr. Ramirez on its claims based on section 523(a)(2). Mr. and Mrs. Ramirez are entitled to judgment in their favor on all other claims. Counsel for 1726 shall submit a proposed form of judgment.

## END OF FINDINGS AND CONCLUSIONS

U.S. Bankruptcy Court - Hawaii   #14-90039   Dkt # 133   Filed  07/21/15   Page 21 of 21